

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-5-2008

# McLaughlin v. Fisher

Precedential or Non-Precedential: Non-Precedential

Docket No. 05-4329

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"McLaughlin v. Fisher" (2008). *2008 Decisions.* Paper 1275.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/1275

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 05-4329
_____

JOHN MCLAUGHLIN;
CHARLES A. MICEWSKI,

v.

MICHAEL FISHER; GERALD PAPPERT;
BRUCE SARTESCHI; DAVID KWAIT;
ROBERT VON SCIO; JAMES CAGGIANO

Gerald Pappert, Bruce Sarteschi,
David Kwait and James Caggiano, Appellants

_____

Appeal from the United States District Court for the
Middle District of Pennsylvania
(D.C. Civil Action No. 3:00-cv-00521)
District Judge: Honorable A. Richard Caputo

_____

Argued: December 20, 2007

Before: LOURIE[*], Circuit Judge, RESTANI[**], Judge, and
OBERDORFER[***], District Judge

_____

[*]Honorable Alan D. Lourie, Judge of the United States Court of Appeals for the
Federal Circuit, sitting by designation.

[**]Honorable Jane A. Restani, Chief Judge of the United States Court of
International Trade, sitting by designation.

[***]Honorable Louis F. Oberdorfer, Senior Judge of the United States District Court
for the District of Columbia, sitting by designation.

(Filed: May 5, 2008)

Samuel C. Stretton (Argued)
301 South High Street
P.O. Box 3231
West Chester, PA 19381

Donald A. Bailey
Bailey, Stretton & Ostrowski
4311 North Sixth Street
Harrisburg, PA 17110

       Counsel for Appellees

W. Thomas McGough, Jr. (Argued)
Reed Smith LLP
435 Sixth Avenue
Pittsburgh, PA 15219

Karl A. Fritton
Amy Z. Snyder
Michael D. Jones
Reed Smith LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103

Charles L. Becker
Kline & Specter
1525 Locust Street, 19th Floor
Philadelphia, PA 19102

       Counsel for Appellants

_____

OPINION OF THE COURT
_____

RESTANI, <u>Judge</u>.

This matter arises from the transfers of appellees John McLaughlin and Charles Micewski (collectively "appellees"), employees of the Pennsylvania Office of the Attorney General ("OAG"), to what appellees perceive as undesirable "temporary" work locations. Appellants Gerald Pappert, David Kwait, James Caggiano, and Bruce Sarteschi (collectively "appellants") appeal from a judgment of the United States District Court for the Middle District of Pennsylvania that was entered, pursuant to a jury verdict, in favor of appellees.

Appellants were senior staff members of then-Pennsylvania Attorney General Michael Fisher and were involved in making the decision to transfer appellees.[1] The jury found that appellants improperly transferred appellees in retaliation for filing a prior lawsuit against Fisher and other government officials. The District Court denied appellants' motion for judgment as a matter of law or, in the alternative, a new trial. The court held that a prior administrative determination by the Pennsylvania Labor Relations

---

[1]Pappert was the First Deputy Attorney General; Kwait was the Chief of the Office of Criminal Investigations, Criminal Law Division; Caggiano was the Deputy Chief of the Bureau of Narcotics Investigation and Drug Control, Criminal Law Division; and Sarteschi was the Director of Human Resources. Fisher is also a defendant in this action, but he does not appeal here. The District Court granted him a new trial, which is stayed pending this appeal. (App. 20 (<u>McLaughlin v. Fisher</u>, No. 3:00-cv-00521 (Order Granting Defs.' Mot. to Certify Final J. & to Stay Trial of Claims Relating to Fisher, June 27, 2005)).) Since conclusion of the trial before the District Court, Fisher has become the Honorable Michael Fisher, Judge of the Court of Appeals for the Third Circuit. Accordingly, no permanent member of the Court of Appeals for the Third Circuit takes part in the consideration of this matter.

3

Board ("PLRB") did not preclude appellees from litigating whether appellants retaliated against them for filing the lawsuit, and that the evidence was sufficient for the jury to find retaliation. Although we decline to give preclusive effect to the PLRB's decision, we conclude that the evidence is insufficient to support the jury verdict. We will reverse the District Court's denial of the motion for judgment as a matter of law and grant judgment in favor of appellants.[2]

## BACKGROUND

The following facts are established in the record. Appellees retired from the Philadelphia Police Department and joined the Philadelphia office of the OAG's Bureau of Narcotics Investigation Unit ("BNI") in 1995. As narcotics agents, appellees investigated cases involving the sale and distribution of narcotics in and around Philadelphia. Their responsibilities involved collecting evidence, preparing criminal complaints and warrants, and appearing in court as witnesses for the prosecution. The United States Attorney's Office for the Eastern District of Pennsylvania ("USAO") and the Philadelphia District Attorney's Office ("DA") prosecute the majority of the cases that Philadelphia narcotics agents present.

---

[2]Although appellants also appeal the denial of their motion for a new trial, we need not address the related arguments in light of our holding. Nonetheless, we note that prior to trial, the District Court ruled irrelevant an internal investigative report prepared for the OAG. Throughout the trial, appellees' counsel indicated that the report either exonerated his clients of misconduct or, at least, found insufficient evidence of misconduct to terminate them. Appellants' counsel consistently objected. We need not address whether this or any other trial conduct would warrant a new trial.

4

In 1996, the USAO and DA called into question the credibility of five Philadelphia BNI agents, including appellees, alleging that the agents knowingly gave false testimony and provided false statements about drug seizures and arrests. The prosecuting offices dismissed a number of criminal cases and requested release of a number of convicted felons as a result of the allegedly false testimony and statements. Both offices refused to prosecute any new cases in which appellees were involved. After an internal investigation, the OAG determined that it did not have sufficient grounds to terminate appellees, whose employment was governed by a collective bargaining agreement ("CBA"). In May 1996, then-Pennsylvania Attorney General Tom Corbett removed appellees from active investigations, thereby limiting the job functions they could perform.

When Fisher became Pennsylvania Attorney General in January 1997, appellees' situation remained the same. In April 1997, seeking to restore a working relationship with the USAO and DA, and to find productive work for appellees, Fisher and certain senior staff members met with the prosecuting offices to discuss appellees' situation. The offices reaffirmed their positions as to their unwillingness to prosecute cases in which appellees were involved. Concluding that appellees could no longer function as productive narcotics agents, the OAG began exploring options available under the CBA to place them in productive positions. The CBA protected appellees from unilateral permanent transfers to other regional offices, but not temporary transfers. Appellants

5

engaged in ongoing discussions through the Summer of 1997 to come up with a solution.

Meanwhile, Fisher's administration was also taking measures to strengthen the OAG's Regulatory Compliance and Intelligence Unit ("Intelligence Unit"), which enforced the Criminal History Record Information Act ("CHRIA") and the Child Protective Services Act. The administration budgeted ten CHRIA agent positions throughout the State to enforce the acts, and aimed to have at least one CHRIA agent in each of the OAG's eight regional offices. CHRIA agents audit state criminal history records, which does not require testifying in court.

On October 6, 1997, Kwait, Sarteschi, and non-defendant William Ryan, Director of the OAG's Criminal Law Division, met with appellees and representatives of appellees' union, the American Federation of State, County, and Municipal Employees, Council 13 ("AFSCME"), to discuss the need for changes in appellees' duties and the need to transfer them to other regions. Ryan offered appellees the option of accepting voluntary permanent transfers to the Intelligence Unit in the Norristown regional office to perform CHRIA work. Appellees, exercising their rights under the CBA, declined the offer.

By letter dated October 8, 1997, the AFSCME requested that the OAG consider assigning appellees to other nearby counties to perform narcotics work as agents from the Philadelphia office. (App. 403–04.) By letter dated October 14, 1997, the OAG denied the request and kept open the initial offers. (App. 405–06.) That same day, October 14,

6

1997, appellees and two other similarly situated agents commenced a lawsuit, entitled

McLaughlin v. Watson, No. 1:97-cv-01555 (M.D. Pa. filed Oct. 14, 1997) ("Watson

Lawsuit"), against Fisher, Corbett, and other government officials.[3] The lawsuit alleged

that the defendants in that case impeded the agents' law enforcement efforts and

destroyed their careers as a result of a conspiracy to protect a Dominican Republic drug

organization with ties to a Dominican political party.

By letters dated November 5, 1997, appellants reassigned McLaughlin and

Micewski to the Intelligence Unit, (App. 407, 409),  and by letters dated November 12,

1997, temporarily transferred them to the Greensburg and Wilkes-Barre regional offices,

respectively, due to "operational requirements," (App. 408, 411).  Greensburg was

approximately 300 miles from McLaughlin's residence, and Wilkes-Barre was

approximately 100 miles from Micewski's residence.[4]

On November 26, 1997, the AFSCME filed an unfair practice charge with the

PLRB, alleging that the OAG violated sections 1201(a)(1) and (3) of the Pennsylvania

---

[3]The other parties were the Assistant Secretary of State for the U.S. State Department; agents of the CIA; then-United States Attorney for the Eastern District of Pennsylvania, Michael Stiles; members of the FBI Task Force; other senior staff members of the OAG; the First Assistant District Attorney of Philadelphia; and certain Dominican Republican nationals.  The District Court dismissed the OAG from that action in March 2002.  (Watson Lawsuit (Order Granting Mot. Summ. J. & Removing from Case, Mar. 1, 2005).)

[4]During their placement in those regions, appellees stayed at hotels during the weekdays, at the OAG's expense, and returned home on the weekends.  McLaughlin spent full days on Mondays and Fridays traveling, and Micewski, on Monday mornings and Friday evenings.  The OAG provided State vehicles to both appellees.

Public Employee Relations Act ("PERA"), 43 Pa. Stat. Ann. §§ 1101.1201(a)(1), (3) (West 2007), by transferring appellees to Greensburg and Wilkes-Barre in retaliation for exercising their rights under the CBA to reject the Norristown offer. (App. 304–07.) The AFSCME also filed a separate charge on behalf of McLaughlin, alleging that the OAG subjected him to additional retaliation.[5] (App. 312–16.) The PLRB issued a complaint, and a hearing examiner conducted a hearing on both charges on September 30, 1998. On October 2, 1998, appellees commenced this action pursuant to 42 U.S.C. § 1983, alleging that appellants transferred them in retaliation for filing the Watson Lawsuit.

In May 1999, the hearing examiner dismissed both unfair practice charges and rescinded the complaints. (App. 320–27 (AFSCME, Council 13 v. Pennsylvania, Nos. PERA-C-97-642-E/PERA-C-97-643-E (Proposed Decision and Order, May 26, 1999) ("PDO")).) The hearing examiner concluded that appellants did not transfer appellees to Greensburg and Wilkes-Barre in retaliation for exercising their rights under the CBA, and that the record was devoid of any inference of anti-union animus. (Id. at 325.) The hearing examiner, rather, determined that appellees had a legitimate business reason for the transfers:

---

[5]The charge alleged that the OAG improperly denied McLaughlin's requests for sick leave and supplemental employment. The hearing examiner dismissed the charge, and the PLRB upheld the decision. (App. 326 (AFSCME, Council 13 v. Pennsylvania, Nos. PERA-C-97-642-E/PERA-C-97-643-E (Proposed Decision and Order, May 26, 1999)); App. 331 (AFSCME, Council 13 v. Pennsylvania, Nos. PERA-C-97-642-E/PERA-C-97-643-E (Final Order, Oct. 19, 1999)).)

8

Mr. Ryan's testimony as to the reason [the OAG] transferred the agents to Wilkes-Barre and Greensburg after they refused the permanent transfer to Norristown, is fully credited. Mr. Ryan is clear and concise when he explains that the first goal of the OAG was to have the problem permanently resolved. In doing so, the OAG attempted to be as fair as possible to the agents, offering them positions that were believed to be convenient to them, although lacking in efficiency to the agency. When the agents declined the offer, and a permanent solution was no longer possible, it opted to temporarily transfer the agents to locations where a need was perceived, instead of temporarily transferring them to Norristown, where no real need existed. As such, it is concluded that a legitimate business reason was the motivating factor in the transfers.

(Id. at 326.) The AFSCME filed exceptions to the PDO.

The PLRB dismissed the exceptions and made the PDO final. (App. 331 (AFSCME, Council 13 v. Pennsylvania, Nos. PERA-C-97-642-E/PERA-C-97-643-E (Final Order, Oct. 19, 1999) ("Final Order")).) The PLRB concluded that the record was devoid of any evidence of anti-union animus, and upheld the hearing examiner's finding that appellants temporarily transferred appellees to Greensburg and Wilkes-Barre for a legitimate business reason. (Id. at 330–31.)

In February 2002, appellants moved for summary judgment in the present action, arguing that the PLRB's decision precluded relitigation of whether they acted for a legitimate, non-retaliatory reason. (Defs.' Br. in Supp. of Mot. for Summ. J. ("Defs.' Summ. J. Br.") 8–9.) The District Court rejected the argument, concluding that the issue the PLRB decided was not the same as the issue in the present action. (App. 43 (Mem., May 20, 2002 ("Summ. J. Mem.")).) The court stated that the PLRB's finding of a legitimate business reason for the transfers was "not preclusive as the PLRB did not

9

consider . . . the filing of the federal lawsuit . . . in reaching its determination." (Id. at 43–44.) Appellants also argued that appellees' only evidence of retaliation, temporal proximity between the filing of the Watson Lawsuit and the transfers, was insufficient to support a claim for retaliation. (Defs.' Summ. J. Br. 7.) The District Court disagreed and submitted the case to the jury. (App. 44 (Summ. J. Mem.).)

After a trial, the jury rendered a verdict in favor of appellees and awarded them a total of $1.5 million in compensatory and punitive damages. Appellants moved for judgment as a matter of law or, in the alternative, a new trial. Appellants again contended that the PLRB's decision precluded relitigation of the reason for the transfers, and that appellees presented no evidence to permit the jury to find retaliation. (Br. in Supp. of Defs.' Mot. for J. as a Matter of Law or, in the Alt., for a New Trial ("Defs.' JMOL Br.") 8–18, 31–43.)

The District Court, based on its prior summary judgment decision, held that preclusion did not apply because the issue that the PLRB decided was not the same as the issue in the present action. (App. 21 (Mem., Mar. 7, 2005 ("JMOL Mem.")).) The District Court reasoned that the issue at the PLRB was whether the OAG had committed an unfair labor practice under PERA, and that the PLRB's factual finding was that the transfers were not motivated by anti-union animus. (Id. at 27.) The court continued that the PLRB did not address whether appellants' business reason for the transfers was pretext for retaliation for filing the Watson Lawsuit, or whether appellants would have

10

transferred appellees absent the filing of the lawsuit.  (Id. at 27–28.)  The court also held

that evidence of temporal proximity between the filing of the lawsuit and the transfers, in

combination with a conflict between the testimony of U.S. Attorney Michael Stiles[6] and

Fisher, permitted the jury to find retaliation.  (Id. at 28–29.)  Appellants appeal.

## JURISDICTION & STANDARD OF REVIEW

The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1343.  We have

jurisdiction under 28 U.S.C. § 1291.  We exercise plenary review of the District Court's

non-application of issue preclusion.  Jean Alexander Cosmetics, Inc. v. L'Oreal USA,

Inc., 458 F.3d 244, 248 (3d Cir. 2006), cert. denied, 127 S. Ct. 1878 (2007).  We also

exercise plenary review of the District Court's denial of a motion for judgment as a matter

of law.  Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993) (citing

Wittekamp v. Gulf & Western Inc., 991 F.2d 1137, 1141 (3d Cir. 1993)).  A motion for

judgment as a matter of law "should be granted only if, viewing the evidence in the light

most favorable to the nonmovant and giving it the advantage of every fair and reasonable

inference, there is insufficient evidence from which a jury reasonably could find

liability."  Id.  "'The question is not whether there is literally no evidence supporting the

party against whom the motion is directed but whether there is evidence upon which the

jury could properly find a verdict for that party.'"  Id. (quoting Patzig v. O'Neil, 577 F.2d

---

[6]Stiles was the U.S. Attorney for the Eastern District of Pennsylvania at the time of
the events.

11

841, 846 (3d Cir. 1978)).

## DISCUSSION

### I.     ISSUE PRECLUSION

Appellants argue that the District Court erred in holding that the PLRB's decision did not preclude appellees from relitigating the motivation for the transfers.  Appellants claim that the PLRB's decision preclusively established that they transferred appellees for a legitimate business reason and therefore bars appellees from now arguing that they were transferred in retaliation for filing a lawsuit.

### A.  General Principles

The doctrine of issue preclusion, also known as collateral estoppel, bars relitigation of issues that have been adjudicated in a prior action.  Allen v. McCurry, 449 U.S. 90, 94 (1980); Edmundson v. Borough of Kennett Square, 4 F.3d 186, 189 (3d Cir. 1993).  Issue preclusion bars re-examination of an issue even in suits on different causes of action.  Allen, 449 U.S. at 94.

Under principles of issue preclusion, "once an issue is raised and determined, it is the entire issue that is precluded, not just the particular arguments raised in support of it in the first case."  Yamaha Corp. of Am. v. United States, 961 F.2d 245, 254 (D.C. Cir. 1992) (citing Sec. Indus. Ass'n v. Bd. of Governors of the Fed. Reserve Sys., 900 F.2d 360, 364 (D.C. Cir. 1990) and Restatement (Second) of Judgments § 27 cmt. c (1982)).  Issue preclusion may foreclose relitigation of an issue "of evidentiary fact, of 'ultimate

12

fact' (i.e., the application of law to fact), or of law." Restatement (Second) of Judgments § 27 cmt. c. Thus, "if the party against whom preclusion is sought did in fact litigate an issue of ultimate fact and suffered an adverse determination, new evidentiary facts may not be brought forward to obtain a different determination of that ultimate fact." Id.; see also Peloro v. United States, 488 F.3d 163, 175–76 n.12 (3d Cir. 2005) (concluding that issues decided by Bankruptcy Court pertaining to certain certificated securities are "broad enough to preclude relitigation of the issue as to all of the certificated securities") (citing Restatement (Second) of Judgments § 27 cmt. c); Sec. Indus. Ass'n, 900 F.2d at 364 (issue preclusion "results from the resolution of a question in issue, not from the litigation of specific arguments directed to the issue"); Cory v. Comm'r of Internal Revenue, 159 F.2d 391, 392 (3d Cir. 1947) ("[T]he parties are not entitled to have a question considered on its merits a second time merely because they failed to produce all the facts the first time."); 18 Moore's Federal Practice, § 132.02[2][d], at 132–26 (Matthew Bender 3d ed. 2006) ("A party therefore cannot avoid issue preclusion simply by offering evidence in the second proceeding that could have been admitted, but was not, in the first, but rather bears the consequences of inadequate litigation by waiving the right to do so in a subsequent case."); 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4417, at 431 (2d ed. 2002) ("The minimum reach of issue preclusion beyond precise repetition of the first action is to prevent relitigation by mere introduction of cumulative evidence bearing on a simple historic fact that has once

13

been decided.").

Under 28 U.S.C. § 1738,[7] federal courts must give state court judgments the same preclusive effect as would the courts of the rendering state. Migra v. Warren City Sch. Dist. Bd. of Educ., 465 U.S. 75, 81 (1984). Under § 1738, federal courts must also give state administrative decisions that have been reviewed by a state court preclusive effect. See Kremer v. Chem. Constr. Corp., 456 U.S. 461, 466–67 (1982) (holding that state court judgment affirming employment discrimination determination by state administrative agency precluded relitigation of issue in federal action). Although § 1738 does not apply to unreviewed state administrative decisions, under federal common-law principles of preclusion, in § 1983 cases, "when a state agency 'acting in a judicial capacity . . . resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate,' . . . federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts." Univ. of Tenn. v. Elliott, 478 U.S. 788, 799 (1986) (quoting United States v. Utah Constr. & Mining Co., 384 U.S. 394, 422 (1966)); see also Edmundson, 4 F.3d at 189 ("[I]n section 1983 cases, only state administrative factfinding is entitled to preclusive effect in the federal courts when the agency ruling remains unreviewed by state courts."). Thus, we

---

[7]28 U.S.C. § 1738 provides that "[t]he . . . judicial proceedings of any court of any such State . . . shall have the same full faith and credit in every court within the United states and its Territories and Possessions as they have by law or usage in the courts of such State . . . ." 28 U.S.C. § 1738 (2000).

14

apply Pennsylvania law to determine whether to accord preclusive effect to the PLRB's factual findings. See Greenleaf v. Garlock, Inc., 174 F.3d 352, 357 (3d Cir. 1999).

In Pennsylvania, issue preclusion applies when four conditions are met: (1) the issue determined in the prior action is identical to the one in a subsequent action, (2) the previous judgment is final on the merits, (3) the party against whom the defense is invoked is identical to or in privity with the party in the first action, and (4) the party against whom preclusion is sought had a full and fair opportunity to litigate the issue in the prior action. Dici v. Commonwealth of Pa., 91 F.3d 542, 548 (3d Cir. 1996) (citing Shaffer v. Smith, 673 A.2d 872, 874 (Pa. 1996) and Safeguard Mut. Ins. Co. v. Williams, 345 A.2d 664, 668 (Pa. 1975)). The Pennsylvania Supreme Court has not addressed whether issue preclusion applies to unreviewed factual findings of the PLRB, but other courts have concluded that it does, see Stokes v. Bd. of Trs. of Temple Univ., 683 F. Supp. 498, 500 (E.D. Pa. 1988) (citing Balsbaugh v. Zeck, 500 A.2d 208 (Pa. Commw. Ct 1985)), aff'd, 872 F.2d 413 (3d Cir. 1989), and we have no reason to conclude that Pennsylvania law would take a different course.

## B. Identity of Issue

In determining whether issue preclusion applies, we must first determine the issue presented before the PLRB. At the PLRB proceedings, appellees had to prove that (1) they engaged in protected activity, (2) the OAG knew of the protected activity, and

15

(3) the OAG was motivated by anti-union animus in transferring them.  (See App. 324

(PDO); App. 330 (Final Order).)  As the first two elements were not disputed, disposition

of the proceedings depended on whether appellees satisfied the third element.  (See App.

325 (PDO); App. 330 (Final Order).)  To establish the third element, appellees provided

testimony to show that appellants transferred them in retaliation for exercising their rights

under the CBA.  (See PLRB Hr'g Tr. 61:1–149:4, Sept. 30, 1998 (available at Defs.'

Reply Br. in Supp. of Mot. for Summ. J., Ex. B & C).)  In response, the OAG offered

testimony to show that they transferred appellees for a legitimate, non-retaliatory reason.

(See App. 325 (PDO); Defs.' Summ. J. Br. 9.)  Based on the arguments, the critical issue

litigated before the PLRB was the reason for the transfers.  Appellants argue that because

this issue is part and parcel of both the PLRB proceedings and the present action,

appellees may not relitigate it here.

In the present action, appellees' sole argument is that appellants transferred them

in retaliation for filing the Watson Lawsuit.  A review of the record does not show that,

before the PLRB, they argued this was a possible reason for the transfers.[8]  In fact,

appellees stated during oral argument that they attempted to raise a free speech retaliation

[8]Although McLaughlin had stated during the hearing that he believed a reason for
the alleged retaliation was that "between the time that we refused a permanent transfer to
Norristown our attorney had to file a lawsuit in the Middle District and that was before
we got transferred," (PLRB Hr'g Tr. 128:12–16), the record does not show submission of
any relevant evidence developing this point.  We do not have a complete record of the
PLRB proceedings, and there are no affidavits addressing what did or did not occur as to
this issue.

16

claim but that the PLRB precluded them from doing so. Nothing in the record supports

this assertion, but appellants agreed throughout the proceedings at the District Court that

constitutional claims may not be raised before the PLRB.[9] (See Defs.' Summ. J. Br.

8 n.4; App. 284 (Defs.' Closing Argument, Trial Tr. 140:4–21, Feb. 7, 2003).)  With this

in mind, we turn to a comparison of what is at issue in the case before us and what

actually was decided by the PLRB.

To establish a First Amendment retaliation claim under § 1983 against a public

employer, a public employee must allege that he or she engaged in activity protected by

the First Amendment, and "the protected activity was a substantial or motivating factor in

the alleged retaliatory action."  Baldassare v. New Jersey, 250 F.3d 188, 195 (3d Cir.

2001) (citing Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287

(1977)).  Once the employee establishes these two elements, the employer may rebut the

---

[9]This position was likely overbroad, as review of Pennsylvania law suggests that retaliation for filing a complaint challenging adverse changes in employment conditions may constitute an unfair labor practice under PERA.  See Fraternal Order of Police Lodge # 10 v. City of Allentown, No. PF-C-93-131-E (PLRB May 30, 1995) (citing Eastex, Inc. v. NLRB, 437 U.S. 556, 565–66 (1978), wherein Supreme Court approved National Labor Relations Board's conclusion that resort to administrative and judicial forums in seeking to improve working conditions constitute protected activity under National Labor Relations Act ("NLRA")); see also PLRB v. Loose, 168 A.2d 323, 325 (Pa. 1961) ("[F]ederal decisions involving provisions of the [NLRA] may be looked to for guidance in interpreting similar provisions in the Pennsylvania statute.").  The Watson Lawsuit charged certain government officials with conspiring with drug organizations to disrupt appellees' careers.  Nonetheless, it is unnecessary to resolve here the question of whether an unfair labor practice charge based on retaliation for the lawsuit filing could have been pursued before the PLRB.

employee's claim by demonstrating that the same adverse action would have taken place in the absence of the protected conduct. Id. (citing Mt. Healthy, 429 U.S. at 287). Here, the parties do not dispute that the filing of the Watson Lawsuit is protected activity. Resolution of the action therefore requires determination of whether the filing of the lawsuit was a substantial or motivating factor in appellants' decision to transfer appellees and, if so, whether appellants would have transferred appellees absent the filing of the lawsuit.

At the PLRB proceedings, appellees bore the burden of proving that anti-union animus motivated the transfers. Appellants claim that they responded to appellees' arguments by showing that they had a legitimate, non-retaliatory reason for the transfers. It is not entirely clear to what extent the PLRB was aware of the Watson Lawsuit. In its order, however, the PLRB did not discuss whether the filing of the lawsuit was considered in reaching its decision. The decision, rather, found that there was a legitimate business reason for the transfers, but it is not clear that the determination meant to exclude every other motive, nor is it clear how the PLRB as finder of fact would have treated mixed motives. Generally, this Court has not found issue preclusion where there was a lack of a clear determination on the facts underlying the constitutional claim or dramatically different legal regimes were involved. See, e.g., Edmundson, 4 F.3d at 191 ("The Commission . . . did not consider, or even speculate about, whether plaintiff would have been discharged had he not violated the police manual by making public statements.

18

Therefore, that proceeding does not give rise to issue preclusion . . . ."); Bradley v.

Pittsburgh Bd. of Educ., 913 F.2d 1064, 1075 (3d Cir. 1990) ("[T]he district court erred in

holding that Bradley was precluded from raising his First Amendment claim.  He must be

given an opportunity to establish a prima facie case that his protected First Amendment

activity was a substantial factor in his dismissal.  If he succeeds, the burden will be on

defendants to show that they would have terminated him in the absence of such protected

conduct."); Kelley v. TYK Refractories Co., 860 F.2d 1188, 1197 (3d Cir. 1988)

("[T]here are no facts in the referee's decision . . . relating to whether Kelley's departure

from TYK occurred in a context of race discrimination in his employment.  Nor can we

infer such findings from the Board's legal conclusion.  Pennsylvania's collateral estoppel

doctrine does not permit us to find an issue has been adjudicated where each tribunal

purportedly confronted with the issue has responded only with silence."); Stokes, 683

F. Supp at 501 ("Although plaintiffs may have to establish pretext in order to prevail here,

the context for that issue will be their specific claim of discrimination, not activity

protected by the Pennsylvania Public Employe [sic] Relations Act."), aff'd, 872 F.2d 413.

These cases largely reflect the view of the Pennsylvania Supreme Court in Odgers

v. Unemployment Compensation Board of Review, 525 A.2d 359 (Pa. 1987).  There, the

court held that even if factual issues are identical, issue preclusion would not apply if the

actions under which the issue is raised have different underlying policies.  See id. at 364;

see also Swineford v. Snyder County Pa., 15 F.3d 1258, 1267–68 (3d Cir. 1994) ("Under

19

<u>Odgers</u>, reviewing courts must look beyond the superficial similarities between the two issues to the policies behind the two actions . . . .  Only where the two actions promote similar policies will the two issues be identical for purposes of issue preclusion.").  The Pennsylvania Supreme Court later explained the limitations of <u>Odgers</u> in <u>Rue v. K-Mart Corporation</u>, 713 A.2d 82 (Pa. 1998).  The court held that an Unemployment Compensation Referee's factual findings precluded relitigation of an issue in a subsequent defamation suit, despite the different policies underlying the Unemployment Compensation Law and defamation, because the issue before the Referee was "an issue of pure fact."  <u>Id.</u> at 85.[10]  The court held that the differences between the public policies were irrelevant because "[a] fact is a fact, regardless of public policy."  <u>Id.</u>

Here, however, it is not so easy to conclude that policy does not impact the determination that there was a legitimate business reason for the transfers.[11]  Appellants

---

[10]The factual issue indeed was easy to isolate from the legal and policy issues.  It involved whether or not theft of food had occurred.  <u>Id.</u>

[11]The public policy behind PERA is "to promote orderly and constructive relationships between all public employers and their employes [sic] subject, however, to the paramount right of the citizens of this Commonwealth to keep inviolate the guarantees for their health, safety and welfare."  <u>Odgers</u>, 525 A.2d at 364 (quoting 43 Pa. Stat. Ann. § 1101.101).  Thus, "PERA was enacted to accord public employees the right to organize and bargain with their employers, in the belief that establishing harmonious relationships between these parties would inure to the public benefit, in part through reduction in the number and duration of work stoppages."  <u>Id.</u>

Section 1983 provides a right to a civil action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."  42 U.S.C. § 1983.  The statute's purpose is to enforce the provisions of the Fourteenth Amendment by permitting an individual to sue for damages for violation of federal statutory or constitutional rights

(continued...)

20

have not demonstrated that the substantive and procedural framework for establishing causation under PERA is sufficiently similar to that which is applied in § 1983 decision-making so that we can say with confidence that the seemingly clear factual determination is not tainted by any underlying legal or policy differences in the two schemes. Thus, we agree with the District Court's conclusion that this suit was not barred by the doctrine of issue preclusion.[12]

## II.  SUFFICIENCY OF THE EVIDENCE

Generally, a factual finding made by a jury is entitled to great deference, not subject to reversal unless no reasonable jury could make such a finding. See Johnson v. Campbell, 332 F.3d 199, 201–02 (3d Cir. 2003) (citing Starceski v. Westinghouse Elec. Corp., 54 F.3d 1089, 1095 (3d Cir. 1995)). Here, however, as will be explained, no reasonable jury could conclude that the evidence supports a claim of First Amendment retaliation.

In their motion for judgment as a matter of law, appellants argued that appellees' evidence of temporal proximity between the filing of the Watson Lawsuit and the

---

[11](...continued)
by a public official acting under state law. Mitchum v. Foster, 407 U.S. 225, 238–42 (1972). The framers of § 1983 intended that the statute provide a federal remedy for persons deprived of constitutional or federally guaranteed rights where there is no remedy under state law or where state law remedies are inadequate. Allen, 449 U.S. at 100–01 (citing Monroe v. Pape, 365 U.S. 167, 173–74 (1961)).

[12]We therefore find it unnecessary to explore the issues of whether appellees were parties or in privity with the AFSCME in the PLRB proceedings, or whether they had a full and fair opportunity to litigate in those proceedings.

transfers was insufficient to support the jury's finding of retaliation. (Defs.' JMOL Br. 14–18.) The District Court, however, concluded that appellees submitted evidence beyond temporal proximity, specifically, evidence of a conflict between the testimony of Stiles and Fisher. (App. 28 (JMOL Mem.).) The court held that "[t]his difference in testimony, in combination with the close temporal proximity, allowed the jury to conclude as they did." (Id. at 29.) The District Court also concluded that the "totality of the circumstances" supported a finding of causation. (Id.) The District Court erred.

### A. Temporal Proximity is Not "Unusually Suggestive"

In proving a causal link between protected activity and adverse action, plaintiffs may rely on "a broad array of evidence." Farrell v. Planters Lifesavers Co., 206 F.3d 271, 284 (3d Cir. 2000). Evidence of timing between protected activity and adverse action, alone, ordinarily is insufficient to demonstrate a causal link unless the timing is "unusually suggestive" of retaliatory motive. Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997) (citing Robinson v. City of Pittsburgh, 120 F.3d 1286, 1302 (3d Cir. 1997)). Where the temporal proximity is not so close as to be "unusually suggestive," courts may look to other types of circumstantial evidence that give rise to an inference of causation. Farrell, 206 F.3d at 280–81.

Here, the parties do not dispute that the transfers occurred on November 12, 1997, but they disagree as to when appellants became aware of the Watson Lawsuit. Appellees presented evidence showing that the complaint for the lawsuit was personally delivered to

22

a receptionist at the OAG the same day it was filed, October 14, 1997. Although appellants testified that they were unsure as to when they received notice of the complaint, Fisher testified that he became aware of the complaint "[a]t least within a couple of days of [October 14]." (App. 150 (Fisher Test., Trial Tr. 223:18–21, Feb. 5, 2003 ("Fisher Test.")).) Viewing this evidence in the light most favorable to appellees, we will assume that appellants became aware of the lawsuit shortly after October 14, 1997, and therefore a little less than one month passed between appellants' notice of the lawsuit and the transfers.

This Court has held that two days between a protected activity and an adverse action is "unusually suggestive" of retaliatory motive, Krouse, 126 F.3d at 503 (citing Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989)), but that three months is not, LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 233 (3d Cir. 2007). While this case obviously falls somewhere in between, the circumstances of the legitimate ongoing mission of finding positions for appellees places this matter nearer to the latter. Moreover, "it is causation, not temporal proximity itself, that is an element of [a] plaintiff's prima facie case, and temporal proximity merely provides an evidentiary basis from which an inference can be drawn." Kachmar v. Sungard Data Sys., Inc., 109 F.3d 173, 178 (3d Cir. 1997). Determining whether temporal proximity alone may create an inference of retaliation is "essentially fact-based . . . depending . . . on how proximate the events actually were, and the context in which the issue came before us." Farrell, 206

23

F.3d at 279. Challenge to the sufficiency of the evidence supporting a verdict of retaliation will involve consideration of the sufficiency of the evidence as a whole. Woodson v. Scott Paper Co., 109 F.3d 913, 921 (3d Cir. 1997).

Even if the temporal proximity of less than one month ordinarily would be suggestive of a causal link, it cannot support an inference of retaliation in this case because the evidence here negates such an inference. First, the transfers took place in the midst of an ongoing process aimed at finding a place to which appellees could be transferred permanently. Second, McLaughlin's testimony that he had told Sarteschi "[o]n a continuing basis" since April 1996 of his intention to file a lawsuit, (App. 64 (McLaughlin Test., Trial Tr. 70:22–24, Feb. 3, 2003 ("McLaughlin Test."))), and appellees' admissions that they had made it generally known months before October 1997 that they intended to file the lawsuit, (Id. (McLaughlin Test. 69:13–18); App. 199 (Micewski Test., Trial Tr. 102:17–103:6, Feb. 6, 2003 ("Micewski Test.")); see also App. 54 (Pls.' Opening Statement, Trial Tr. 31:4–5, Feb.3, 2003)), undermine any suggestiveness of the timing here. These matters are explored further in Part II.C.

## B. The Alleged Conflict in the Testimony of Stiles and Fisher is Insufficient to Create an Inference of Retaliation

Although the District Court likely incorrectly thought that the temporal proximity here "create[d] a strong inference [of retaliation] in and of itself," (App. 28 (JMOL Mem.)), the court buttressed its conclusion of sufficient evidence by relying on a perceived difference in the testimony between Stiles and Fisher. Stiles' testimony

24

concerned an August 1998 meeting, almost one year after the transfers, wherein Stiles and possibly Fisher discussed the FBI renting a space in the Philadelphia office located on Essington Avenue. According to the District Court, Stiles testified that, at the meeting,"he told [] Fisher that his federal agents could work at the same location as [p]laintiffs," and Fisher testified that "Stiles never told him [p]laintiffs could work in the same location as [the] federal agents." (Id. at 28, 29.) The District Court misinterpreted Stiles' testimony.[13]

_____

[13]Fisher's testimony was as follows:

> Q.    Well, did he – let's not stand on semantics. I want the crux of this.
>        Did Mr. Stiles, in any way, you can use his language, only concur or not object to the Essington Avenue office having, even periodically or permanently, the presence of my clients?
> A.    No.
> Q.    He did not?
> A.    He did not.
> Q.    He did not object to that?
> A.    He did not – no, he – Mr. Stiles was not willing – your statement is inaccurate. Your question is inaccurate the way you stated it.
> Q.    Let us cut to the chase. Are you telling us that Mr. Stiles never told you that he would be satisfied and could live with my clients being in the Essington Avenue office sometime in 1998, that is, August, September, October of 1998?
> A.    It's my recollection that it wasn't – Mr. Stiles was – Mr. Stiles had a lot of concerns involving cases that were handled by your clients and had concerns in working with our BNI office in Philadelphia, if your clients were involved in our operation in any way. That was my recollection. The issue of people moving into the office was really entirely different and separate from the issue that I think is before this Court.

(continued...)

25

First, a reading of the testimony shows that Stiles could not clearly recollect whether he had spoken to Ryan or Fisher. (See App. 114–15 (Stiles Test., Trial Tr. 80:1–6, 82:4–83:1, Feb. 5, 2003 ("Stiles Test.")).) Second, even if Stiles had spoken to Fisher, based on the testimony, a jury could not reasonably conclude that Stiles told Fisher that he approved of the FBI agents working in the same location as appellees.[14]

---

[13](...continued)
(App. 149 (Fisher Test. 217:22–218:23).)

[14]The relevant portion of Stiles' testimony was as follows:

> Q. [T]here was a second meeting or conversation with [Fisher] where you said, after checking with FBI agents and others, you had no objection to my clients being present in Essington Avenue?
> A. No. What I said was, after checking with the FBI and others, we had no objection to locating the task force in the Essington Avenue unit or building, notwithstanding the fact that one of the original Plaintiffs [not appellees], one of the BNI agents, was still assigned to Essington Avenue.
> Q. And that position was made known to Mr. Fisher, am I correct?
> A. Yes.
> . . . .
> A. Well, I know it was made known at one of the regular meetings we had with members of the Attorney General's Office. I think Mr. Fisher was there and I told him directly, it might have been Mr. Ryan. But we did make that known to them and thereafter I believe they located the FBI agent there.
> Q. And is it fair to say that you communicated with Mr. Fisher and his staff that ultimately you could work with your agents at the Essington Avenue Office even with the presence of my clients?
> A. I think I just said that. I didn't refer to Mr. McLaughlin [or] Mr. Micewski. I knew at that time that another original Plaintiff was at the Essington Avenue Office and we said notwithstanding that, they had gone down to inspect the premises and they were willing to locate . . . the FBI unit down there.

(continued...)

26

Stiles' testimony, read as a whole, indicates that he accepted the presence of another

agent in the Essington Avenue office, and reaffirms that he had reservations concerning

---

[14](...continued)
(App. 114 (Stiles Test. 79:12–80:16).)  The testimony continues:

> Q.    Would [the underlined portion of the deposition] refresh your recollection . . . that . . . you let the word out that you had no objection to the presence of these agents, to use the plural, in the Essington Avenue Office?  Was that your testimony back then, and does that refresh your recollection?
> . . . .
> [A.]    Well, the question that you've underlined is, and it was ultimately communicated to them that you could work with their presence.
> And my answer was, correct.
> Now, I haven't gone back to read all of the earlier question . . . , but . . . I know at the time that there was one original Plaintiff there.
> . . . .
> Q.    That was Mr. McKeefery?
> A.    Agent McKeefery.  And I think, frankly, there was a discussion, there was the possibility that your clients, . . . Agent McLaughlin or Agent Micewski, might be transferred back there at some point.  I had originally had reservations about that when I met with [Fisher]
> . . . .
>
> . . . .
> And I expressed that . . . .  I went back and talked to the FBI.  I asked the FBI, does [sic] the investigating, go down, look at the premises.  They went down.  They said it was a separate unit, separate computers, separate entrances.
> I said, ultimately, this really isn't my call.  It's your call, FBI.  If you don't have an objection to it, that's fine.  They said they could use the space down there.  They could rent it.  And I told that to the Attorney General.
> Q.    To Mr. Fisher directly or to someone –
> A.    I'm not positive.  I can't remember whether it was Mr. Fisher directly or Mr. Ryan.

(Id. at 115 (Stiles Test. 81:4–83:1).)

appellees' presence, as others also testified.[15]  In addition, as indicated, the 1998 meeting took place a year after the transfers at issue, and the location at that time of the state agents within a building utilized by federal agents has little to do with this action.  At most, knowingly false testimony could be used to show a general improper intent on the part of non-appellant Fisher, but this testimony provides no such basis, even if it were relevant.  Thus, the District Court erred in relying on the "difference" in the testimony in holding that the evidence was sufficient to support the jury verdict.

### C.  The Totality of the Circumstances

Nor could the evidence in the "totality of the circumstances" support the verdict. Appellees rely on an array of additional evidence to support their claim of retaliation. Appellants, however, have provided indisputable explanations to rebut most of the evidence, and the remainder is non-probative.

Appellees rely on evidence showing that they were still testifying as witnesses for the OAG from 1997 through 2000.  The evidence, however, shows they were called to testify only in old cases and retrials.  There is no evidence that they were testifying on new criminal cases.  As to Micewski's testimony that appellants never gave him an

---

[15]Indeed, Pappert and Kwait testified that Stiles had expressed concerns with appellees being in the same building as the FBI agents.  (App. 167 (Pappert Test., Trial Tr. 289:2–5, Feb. 5, 2003 ("Pappert Test.")); App. 227–28 (Kwait Test., Trial Tr. 216:25–217:24, Feb. 6, 2003 ("Kwait Test.")).)  Pappert also stated that Stiles did not object to and accepted the presence of another agent in the building.  (App. 167 (Pappert Test. 289:6–15).)

opportunity to respond to the Norristown offer, he admitted that he never apprised the OAG of any willingness to accept the offer, (App. 211 (Micewski Test. 152:2–6)), and the record does not show that he ever objected to the PLRB's finding that he had rejected the offer. In response to McLaughlin's assertions that appellants' denial of his sick leave requests were retaliatory, appellants explained that they thought he was attempting to circumvent the transfer, as he made the claim as soon as he was reassigned and also defiantly reported to the Philadelphia office. In any event, his request for leave was granted after he produced the documentation required for the type of leave he was seeking. (App. 148 (Pappert Test. 213:1–6); App. 185 (Sarteschi Test., Trial Tr. 48:6–15, Feb. 6, 2003).) Further, although an Intelligence Unit supervisor testified that appellants had instructed him to treat appellees differently, he also stated that the disparate treatment resulted from directives to only assign work to appellees that do not require them to testify, and directives to not assign them to do work in the Essington Avenue office. (App. 111 (McGinnis Test., Trial Tr. 68:11–20, Feb. 5, 2003 ("McGinnis Test.")).)

Although the District Court did not cite the following reasons as specifically supporting the verdict, appellees also rely on a lack of documentation concerning discussions or plans related to the transfers, and their own testimony that there was little work for five months at the Greensburg and Wilkes-Barre offices and that neither of the supervisors at those offices were expecting them. As evidence at trial indisputably established, however, the OAG was in the process of implementing plans to recreate the

Intelligence Unit, and in such a situation, implementation is not instantaneous. The November 12, 1997, letters apprising appellees of their transfers state that "operational requirements" were the reasons for the transfers, (App. 408, 411), and appellees never rebutted the evidence that the Norristown office did not have any open positions designated for the revived unit. Further, consistent documentary and testimonial evidence from persons in positions with knowledge established that there were open positions in Greensburg and Wilkes-Barre.[16] (See App. 147, 163 (Pappert Test. 210:14–212:4, 273:10–274:3); App. 221 (Kwait Test. 189:11–191:15); App. 254 (Ryan Test. 20:23–25); App. 412.) While no memos prior to October 1997 mentioning Greensburg or Wilkes-Barre in particular were uncovered, in July 1997, prior to the filing of the Watson Lawsuit, appellees had noted the option of transferring appellees and another agent to three different regions. (See App. 356.) In any case, assuming arguendo that any of the evidence as to conditions at Greensburg and Wilkes-Barre would contribute to a conclusion that there was an improper motive for the transfers, the evidence does not assist a juror in determining whether appellants transferred appellees as a result of a non-actionable motive to persuade appellees to accept permanent transfers or an actionable free speech retaliation motive. That is, no reasonable jury could have determined that a free speech retaliation motive for the transfers existed based on such

---

[16]There was only hearsay testimony and speculation to the contrary. (See App. 104 (McGinnis Test. 38:25–39:11); App 201 (Micewski Test. 111:5–21); see also App. 166 (Pappert Test. 286:16–287:17).)

evidence in the factual context of this case.

Not only is there insufficient evidence to support the verdict, there is significant evidence negating any actionable retaliatory motive. First, non-appellant Fisher is the only common defendant in this action and the Watson Lawsuit, and he was merely one of numerous individuals sued there because of their professional positions. Although self-serving, appellants all testified that the Watson Lawsuit was part and parcel of grievances and suits to be expected and did not influence their decision to transfer appellees, and there is no evidence Fisher ever directed them to take any steps based on that action against him. Further undermining appellees' theory of free speech retaliation is their own testimony that they had made it generally known for more than a year prior to October 1997 that they intended to file a lawsuit. (See App. 64 (McLaughlin Test. 69:13–18); App. 199 (Micewski Test. 102:18–103:6).) Despite these admissions, appellees did not submit any evidence showing that retaliatory animus based on threats of a lawsuit existed during this period. Also problematic for appellees' argument is the fact that the pre-lawsuit compromise option of permanent employment at Norristown seemed to remain, and appellants have allowed McLaughlin to work in the Norristown office since April 1999 on a "temporary" basis. McLaughlin apparently reached an agreement with appellants whereby appellants reassigned him to the Norristown office on that basis, which obviously was not a cost advantage to the OAG. (See App. 76 (McLaughlin Test. 117:21–118:13).) Given the need to place appellees in some useful positions and all of

31

the evidence, no reasonable jury could have found that the filing of the Watson Lawsuit motivated the transfers, as opposed to a proper motive, or even a non-actionable improper motive.[17]

Rather, the evidence indicates that the filing of the long-anticipated lawsuit occurred in the midst of a necessary, ongoing effort to place appellees in productive positions, and at the same time that appellees rejected the only viable permanent solution that appellants had to their situation, a situation which appellants did not create and could not control, and which cannot be reasonably disputed.[18] That is, appellees could not function as narcotics agents because the local and federal prosecutors would not accept their cases, and appellees proposed only narcotics agent solutions.

## CONCLUSION

Because we find that the evidence is insufficient to permit a reasonable jury to find that appellants transferred appellees in retaliation for filing a lawsuit, we reverse the District Court's denial of appellants' motion for judgment as a matter of law and grant the

---

[17]Whether or not a jury could have reasonably found that appellees were temporarily transferred in retaliation for rejecting the permanent Norristown offer, this issue is not before us, was not before the jury, and the PLRB has conclusively determined otherwise.

[18]We do not suggest that the filing of the Watson Lawsuit immediately after the compromise offer of permanent employment at Norristown was intended to solidify that offer as the floor for further negotiations. Nonetheless, the possibility of using such a tactic highlights the importance of ascertaining that any jury verdict of free speech retaliation in such a negotiation context be based on sufficient evidence and not mere speculation.

32

motion in appellants' favor.

Judgment will enter accordingly.